Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND GOODROW, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SONOS, INC.<br><br>Defendant. | Case No.<br><br>_____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................. 1

II.  JURISDICTION AND VENUE ................................................ 5

III.  PARTIES ........................................................................ 6

IV.  SUBSTANTIVE ALLEGATIONS ........................................... 7

    A.  The Background and Development of Sonos .................... 7

    B.  Sonos Places Greater Focus on Portable Products, and Develops the App Redesign to Support Those Uses ............................... 13

    C.  Sonos Releases the App Redesign, Touting Improved Performance 17

    D.  The Sonos Devices .................................................. 28

    E.  The App Redesign Degraded the Performance of Sonos Devices.... 29

V.  CLASS ACTION ALLEGATIONS ........................................... 42

VI.  CAUSES OF ACTION ....................................................... 46

    COUNT I  VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT 18 U.S.C. §§ 1030, ET SEQ ........................................ 47

    COUNT II  VIOLATIONS OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT CAL. PENAL CODE §§ 502, ET SEQ ........................................................................ 49

    COUNT III  VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500 ET SEQ ............................................................ 51

    COUNT IV  TRESPASS TO CHATTELS ................................. 53

    COUNT V  VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL") CAL. BUS. & PROF. CODE §§ 17200, ET SEQ ....................................................... 54

    CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS COUNT VI ........................................................... 56

VII.  PRAYER FOR RELIEF ..................................................... 59

i
CLASS ACTION COMPLAINT

VIII.  DEMAND FOR TRIAL BY JURY ........................................................... 60

CLASS ACTION COMPLAINT

Plaintiff Raymond Goodrow ("Plaintiff"), individually and on behalf of all other persons similarly situated, as defined herein, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendant Sonos, Inc. ("Sonos" or the "Company"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters.

## I.  INTRODUCTION

1.   Sonos is a pioneer of multiroom, wireless streaming speaker systems. Sonos sells a variety of products, including speakers, amplifiers, and network audio streamers, that are capable of streaming music directly from online streaming services or from other audio sources connected to the Internet or a user's home wireless network (or "WiFi"). Multiple Sonos speakers can be connected to the same system to play audio simultaneously without being connected by wiring.

2.   Sonos products are installed and controlled using an application ("app") that Sonos has developed for devices running iOS or Android operating systems, or on a desktop computer (later replaced by a web app run via an Internet browser).

3.   This Sonos app (the "Sonos App" or "App")[1] is necessary for full use of Sonos products. The App must be used to install new devices, change their

---

[1] "Sonos App" refers to all versions of the application released by Sonos for purposes of controlling Sonos Devices (defined in ¶ 60 herein), including the "App Redesign" version first released on May 7, 2024, and all sub-versions of the application. Further, it includes all versions

settings, or troubleshoot issues. In addition, it can control audio playback, such as choosing songs (or other audio sources like podcasts) to play, creating a playlist or "queue" of songs, and changing the volume, among other basic functions. The app is also used to change which speakers in a Sonos system are playing. For instance, a user can use the app to transition music playing from a speaker in their dining room to one in their living room. One key feature of the Sonos App is that it supports scores of outside music streaming services, such as Spotify and Apple Music. By connecting these services to the Sonos App, a user can search all of their connected services simultaneously, play songs from all of them, and even create a playlist or queue with songs from multiple services.

4.     Sonos periodically releases updates to the Sonos App. These usually involve minor changes. On May 7, 2024, however, Sonos released what it called a "redesign" of the app (the "App Redesign"), which was substantially different than the prior version.

5.     Sonos encouraged users to download and install the App Redesign, telling them that it offered an easier, faster, and better experience than earlier versions of the Sonos App. Sonos also forced users to update to the App Redesign when their device firmware (software that is built into computing hardware itself,

---

for iOS and Android operating systems, as well as versions for desktop computers and web browsers.

CLASS ACTION COMPLAINT

such as a Sonos speaker, to perform basic functions and enable the hardware to communicate with other software) had been updated, sometimes automatically.

6.     However, users soon found that the App Redesign was significantly worse than prior versions. First, the App Redesign had numerous bugs. For instance, it caused users to frequently lose the connection between the Sonos App and their Sonos devices, which would stop audio playback. Users also found it difficult, and at times impossible, to reestablish the connection between their devices and the Sonos App, rendering their devices unusable. In addition, Sonos devices would often "disappear" from the Sonos system, meaning those devices would not appear in the Sonos App and users thus could not use them until the issue was resolved. The App Redesign also caused significant delay, or "lag," between user input and the App's response. Moreover, the App frequently crashed, suddenly stopping audio playback and all other functionality.

7.     Second, the App Redesign lacked numerous features included in prior versions of the Sonos App. For instance, prior versions included an "alarms" feature that allowed a user to schedule a song to play at a specified time. However, this was missing in the App Redesign. Sonos later conceded that it had discovered a "data corruption error" affecting that feature and chose to disable the feature for all users. But Sonos did not disclose that at the time it released the App Redesign.

CLASS ACTION COMPLAINT

8.      The App Redesign substantially degraded the performance of Sonos Devices such that users could not use many of the features that caused them to buy Sonos Devices in the first place. The Company quickly faced a deluge of user complaints. In the wake of this debacle, hundreds of employees were fired and the Company's Chief Executive Officer ("CEO"), Thomas Spence, abruptly stepped down. He was soon followed by the Company's Chief Commercial Officer, Deirdre Findlay; Chief Product Officer, Maxime Bouvat-Merlin; and Global Chief Marketing Officer, Jordan Saxemard. To date, over a year after its release, the App Redesign still does not have all of the features that were included in previous App versions, and users continue to experience significant performance problems.

9.      In the face of a strong backlash from its customers, Sonos conceded that, in a "push for speed," it released the App without fixing problems it knew about, and did not warn users. Spence, the CEO at the time, acknowledged that "many of our customers are having an experience that is worse than what they previously had."

10.     As later became clear, Sonos rushed the release of the App Redesign to avoid delaying the launch of its first headphone product, which Spence told investors was expected to be a blockbuster product. Through internal testing and concerns raised by employees, Sonos was aware that the App Redesign had

numerous bugs and lacked many functions that users enjoyed with the prior App version.

11.    Despite this knowledge that releasing the App Redesign would significantly degrade the performance of Sonos Devices and the experience of Sonos users, Sonos told users the opposite: that it would be a faster, better, and smoother experience. Sonos did not warn users about these performance problems and thus deprived them of the ability to make an informed decision about whether to download the App Redesign despite these many flaws. Despite Company promises that it would promptly fix the App, performance problems caused by the App Redesign continue to plague users to this day.

## II.    JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Sonos is a citizen of a State different from that of at least one Class member.

13.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff alleges that Sonos violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, *et seq*.

CLASS ACTION COMPLAINT

14.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Sonos's principal place of business is located in this District and substantial parts of the events or omissions giving rise to the claims occurred in the District. Venue is also proper in this Court because Sonos is located here, the causes of action arose here, and the Sonos Devices and App Redesign at issue here were, at least in part, designed, and tested by Sonos in this District.

## III.    PARTIES

16.     Plaintiff Raymond Goodrow has been a resident of Massachusetts at all relevant times. He is the owner of a Sonos Play:1 speaker and a Sonos One SL speaker. He downloaded the App Redesign in or around May 2024, and he saw descriptions of the App Redesign issued by Sonos before or during the download process. After downloading the App Redesign, he has experienced significant performance problems that he did not experience with prior versions of the Sonos App. The App will not connect with any music streaming services, such as iHeartRadio. At times, he cannot stop the music that is playing, forcing him to unplug his speakers to accomplish this, which creates a delay in playing music again as the speakers must boot up and reconnect to his home network and Sonos

App before doing so. These performance problems are so severe that he would demand a full refund of what he paid for his Sonos Devices to address the damage that was caused by the App Redesign. If he had been clearly informed that the App Redesign would seriously impair his ability to use his Sonos Devices in these ways, he would not have downloaded the App Redesign. He will have to decide whether to download future updates to the Sonos App and so will need to rely on Sonos's representations about those updates in the future.

17.    Plaintiff is the owner of Sonos Devices who suffered significant performance problems as a result of the App Redesign. Plaintiff continued using his Sonos Devices after downloading the App Redesign, despite the problems described above, because he did not want to spend the significant amount of money it would cost to replace his Sonos Devices.

18.    Defendant Sonos, Inc. is a corporation that was created under the laws of the State of Delaware and has its principal place of business in Santa Barbara, California. Sonos develops, sells to consumers, markets, distributes, and/or directs into the stream of commerce the Sonos Devices and the Sonos App.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Background and Development of Sonos

19.    The Company incorporated in Delaware in August 2002 as Rincon Audio, Inc, and changed its name to Sonos, Inc. in May 2024.

20.    Sonos began in 2002, when four friends – John MacFarlane, Tom Cullen, Trung Mai, and Craig Shelburne – began working together to develop a new type of multi-room home sound system that did not require extensive wiring. At the time, setting up a multi-room home audio system required numerous components connected by audio cables, which often involved drilling through walls to connect components in different rooms.

21.    The mission to create a wireless multi-room home sound system was well-timed, given the growth of audio streaming services and the adoption of voice assistants – trends that have continued in the years since. It has been estimated that the number of paid music streaming subscribers in the United States rose from 7.9 million in the first half of 2014 to 99 million in the first half of 2024, and there are many more people using unpaid streaming services.[2]

22.    Sonos's founders sketched out a system architecture that would employ the user's home wireless network and/or a "mesh" network created by the Sonos products themselves to transmit audio to Sonos speakers, which could be assigned to different "zones" and controlled separately. For instance, a user could assign speakers to a "living room" zone and a "dining room" zone, and play music

---

[2] Patrick Leu, *Paid streaming music subscribers in the U.S. 2014-2024*, Statista (Oct. 24, 2024), https://www.statista.com/statistics/707103/paid-streaming-music-subscribers-usa/

in the living room zone, then switch the music to the dining room zone, and then play it in both zones at the same time.

23.     In 2005, Sonos shipped its first product, called the ZonePlayer 100, or ZP100. This was not a completely wireless solution. The ZP100 was not itself a speaker, and Sonos did not sell any speakers at that time. Rather, the ZP100 connected to a user's existing speakers via audio cables. A user could place multiple ZP100s throughout their home and connect them via Sonos's proprietary wireless technology (called SonosNet) or via wired Ethernet connections. The user could connect audio sources such as CD players, or stream from Internet radio stations as well as a music streaming service then called "Rhapsody," which was the first outside digital music service supported by Sonos.

24.     The ZP100 met with positive reviews from users and industry experts. The Company then launched second- and third-generation systems that could stream audio directly to players, or speakers.

25.     At that time, users employed a Sonos-manufactured remote control, rather than an app. (Apple's iPhone – and App Store – did not launch until 2007.) In 2008, Sonos launched its own, free app for iPhone (and iPod Touch) users, enabling them to use their phone, rather than a Sonos remote control, to control their Sonos devices. Sonos App versions for other devices running Apple's iOS

operating system were later introduced. The Company introduced a Sonos App for Android users in 2011. The Company discontinued Sonos remote controls in 2012.

26.    Since the Company launched Sonos apps for iOS and Android devices, and discontinued the Sonos remote, it has designed its products to be controlled via the Sonos App. The Sonos App is the primary way that the Company intends for users to control their Sonos Devices, and it is necessary to initially connect any Sonos Device to the internet (and thus enable streaming directly to the device), to add devices to a system or network, to create zones, to change device and system settings, and to troubleshoot technical issues.

27.    In November 2009, Sonos released the ZonePlayer S5, later called the Play:5. This Sonos Device was the Company's first independent amplified speaker. It was a speaker that could directly stream from Internet audio sources. Multiple Play:5 speakers could be added to a user's system and communicate wirelessly.

28.    Since then, the Company has added numerous products, including the following Sonos Devices:

(i)    Play:3: released in July 2011, the Play:3 is a smart speaker with the same streaming capabilities as the Play:5, but with less powerful speaker components. For instance, the second-generation Play:5 has three tweeters and mid-woofers, with six

CLASS ACTION COMPLAINT

Class-D amplifiers, while the Play:3 has a single tweet, two mid-woofers, and three Class-D amplifiers.

(ii)    Play:1: released in October 2013, the Play:1 is another smart speaker, similar to the Play:3 and Play:5, but with less powerful speaker components.

(iii)    Sonos One: released in October 2017, the Sonos One is a smart speaker, representing the next generation of the Company's smart speakers, after the "Play" speakers.

(iv)    Beam: released in July 2018, the Beam is a smart soundbar. Soundbars are speakers in the shape of a bar lying horizontally, designed to be placed under a television to supplement or replace the television's own speakers.

(v)    Move: released in September 2019, the Move was Sonos's first portable smart speaker. It has an internal rechargeable battery and thus can function without being plugged into an external power source.

(vi)    Port: a network audio streamer that connects to traditional audio equipment, i.e., that does not itself have streaming capabilities, enabling them to play streaming audio sources and to be connected to a Sonos system.

(vii)    Amp: another product that connects to traditional equipment so that they can play audio streaming sources and be connected to a Sonos system; it also amplifies the audio source and thus can power passive speakers, which do not have their own amplifier or power source.

29.    The Company has released multiple generations of most of its products. For instance, the second generation of the Sonos One – called the Sonos One Gen 2 – had a more powerful processor than the first generation, among other changes.

30.    The Move, as well as later portable smart speaker Sonos Devices such as the Move 2, the Roam, and the Roam 2, constituted part of the Company's increasing emphasis on portable products that were designed to be used outside of the user's home.

31.    Over the years, Sonos has added support for other outside streaming audio services, including Sirius XM and Spotify in 2011, allowing users to connect these apps to the Sonos App and use the Sonos App to select, play, and control audio in those apps. For instance, a Sonos user with a Spotify account can connect their Spotify app to their Sonos App and use the Sonos App to search the library of audio available on Spotify and play it using the Sonos App. By using the Sonos App, a user can search and play the combined audio library of all audio apps

connected to the Sonos App, as well as local audio sources (such as a server containing audio files). For example, a user with both Sirius XM and Spotify can, through the Sonos App, play music from both services. Sonos added support for Amazon Music in October 2015, for Apple Music in February 2016, and for scores of other streaming services thereafter, including iHeartRadio.

32.     The ability to perform a combined search of multiple audio sources (such as streaming services) is a key feature of the Sonos App and is very important to users.

33.     On August 6, 2018, Sonos completed the initial public offering of its common stock. Since then, the Company's revenues have grown significantly, from $1.1 billion for the fiscal year ended September 29, 2018, to $1.7 billion for the fiscal year ended September 30, 2023. For fiscal year 2024, Sonos reported that it had a total of nearly 50.4 million products registered in in approximately 16.3 million households globally, and that these households averaged 3.1 Sonos devices each. For that fiscal year, approximately 61% of the Company's revenue was from the United States. The United States also accounted for the majority of the Company's revenue in 2021, 2022, and 2023.

**B.     Sonos Places Greater Focus on Portable Products, and Develops the App Redesign to Support Those Uses**

34.     Though the Company's product offerings were primarily intended for home use, it sought to capture additional market share by offering portable

products. The Move and Roam speakers, for instance, can be connected to a home-based Sonos system, but they are portable and can be used independently of a home system. In 2019, the Company began work on a set of headphones, but did not announce a product.

35.     With growth stagnating—revenue fell 5.5% from 2022 to 2023—Sonos committed to introducing new products to drive revenues. In fiscal year 2023, the Company launched the Era 100 and Era 300, the Company's new generation of smart speakers. However, as then-CEO Spence acknowledged on November 15, 2023, fiscal year 2023 was a "challenging year in the categories in which we play."

36.     Spence then made an announcement hinting that the Company would finally launch a headphones product, stating that the Company was

> [at] the beginning of a multi-year product cycle where we expect to reap the rewards of our R&D investments. This cycle begins with our ***entry into a new multi-billion dollar category*** in the second half of the year that will complement our current offering, delight customers and drive immediate revenue.[3]

37.     Spence did not identify the "new multi-billion dollar category," but six days later *Bloomberg* reported that Sonos "will make a long-awaited push into

---

[3] Unless otherwise noted, emphases throughout this complaint are added where words are both bolded and italicized. Emphases throughout of words that are only bolded or only italicized were present in the original.

headphones with a model priced upwards of $400 that's slated to be released as early as April, according to people familiar with the matter."[4]

38.     *Bloomberg* noted that "[t]he company is considering charging between $400 and $500 for the product," which would compete against premium offerings like Apple's AirPods Max, but "the company isn't trying to outperform Apple on a technical basis — its marketing message will be more about leveraging the Sonos brand and its ability to fine-tune the sound, the people said." ("Fine-tuning" the sound of Sonos products is, of course, done in the Sonos App.)

39.     After first releasing the Sonos App in 2008, the Company periodically released updates. In June 2020, it released a major update it dubbed "S2," at which point it renamed the original Sonos App as "S1". Though some products were compatible with both S1 and S2, all Sonos Devices manufactured after June 2020 were incompatible with S1.

40.     As part of the Company's increasing focus on portable products, and the planned headphones in particular, the Company began work on making the Sonos App better suited to these product uses. As *Bloomberg* reported, Sonos's project to redesign the Sonos App, codenamed "Passport," was intended to "let

---

[4] Mark Gurman, *Sonos Readies $400-Plus Headphones to Rival Apple and Bose, TV Set-Top Box*¸ Bloomberg (Nov. 21, 2023 5:18 PM), https://www.bloomberg.com/news/articles/2023-11-21/sonos-plans-400-500-headphones-tv-set-top-box-video-roam-2-new-sound-bar

CLASS ACTION COMPLAINT

users control the headphones and other mobile Sonos gear from a smartphone app when away from their home internet." In contrast to earlier updates, this was a more substantial undertaking: a complete redesign of the app for both iOS and Android devices as well as web browsers. Despite the large scope of that project, the Company conducted a reorganization led by its Chief Product Office and trimmed its product development staff, first in June 2023 and again in August 2023, in line with Spence's pledge to investors to rein in expenses.

41.    The release of the App Redesign was intended to be coordinated with the planned headphone launch. Spence told analysts during the Company's February 6, 2024 earnings call that "we now turn our undivided attention to the launch of our highly anticipated new product, which we will announce and ship in Q3," adding that "[t]his launch will give us a foothold into a new multibillion-dollar category, expanding the number of categories we play in from five to six and further diversifying our business."

42.    It was widely understood that Spence was referring to headphones, though he did not acknowledge that explicitly. Citing insider sources, *Bloomberg* confirmed on February 27, 2024, in line with its previous reporting and industry speculation, that the forthcoming new product was a wireless headphone set. The headphones, called the Ace, were eventually launched in June 2024.

CLASS ACTION COMPLAINT

43.     With the planned headphones launch on the horizon, releasing the App Redesign was essential to Sonos's strategy. *Bloomberg* reported that the Company wanted to release the App Redesign "at least a few weeks before the headphones debut." However, the effort was not going smoothly. According to later reporting, employees worried that the Company's "drive to attract new customers, and Spence's promises to investors, were taking precedence over ensuring equipment already owned by longtime loyal customers would continue to function as expected."[5]

44.     Sonos planned to release the App Redesign in March 2024, but that was delayed due to software engineering challenges. The Company had a list of "essential" bugs that needed to be fixed before launch. However, "[b]ugs it deemed to be less critical, or functionality it felt could be left off temporarily, would be dealt with after the launch" — unbeknownst to users.[6]

**C.     Sonos Releases the App Redesign, Touting Improved Performance**

45.     The Company officially revealed the App Redesign on April 23, 2024, issuing a press release that called the App Redesign a "[m]odernized app and

---

[5] Dave Lee, *How Sonos Botched an App and Infuriated Its Customers*, Bloomberg (Sept. 23, 2024 7:30AM), https://www.bloomberg.com/opinion/articles/2024-09-23/how-sonos-botched-an-app-and-infuriated-its-customers

[6] *Id.*

platform [that] puts listeners in the driver's seat with a personalized experience that makes listening *easier, faster and better*." The press release further stated:

> **Sonos (Nasdaq: SONO)** today revealed its ***most extensive app redesign ever, creating an unprecedented streaming experience that allows listeners to organize their favorite playlists, stations, albums and more from over 100 services on one customizable Home screen***. The new Home screen provides faster access to Sonos system controls with one easy swipe up, making tab to tab jumping a thing of the past. As a leader in sound experience that's focused on creating a better way to listen, Sonos ***intentionally redesigned the app on a modern software platform for an easier, faster and better experience*** that can support more rapid innovation. The reimagined app supports all existing S2 products and will be available globally through a software update for the S2 mobile app and via an all-new web app on May 7, 2024.

> "We introduced the world to multi-room music over 20 years ago, and are proudly playing in over 15 million homes today. As we are always pushing ourselves to innovate, and listening to feedback from our passionate customers, we felt now was the time to reimagine our app experience," said Patrick Spence, CEO of Sonos. "***After thorough development and testing, we are confident this redesigned app is easier, faster and better.*** It once again raises the bar for the home music listening experience, and sets up our ability to expand into new categories and experiences."

> "Today's streaming experience has become fragmented across multiple platforms due to varied content offerings, algorithmic curation, or simply the desire to not recreate playlists in multiple locations," said Maxime Bouvat-Merlin, Chief Product Officer of Sonos. "***As the only audio brand with an open platform offering extensive choice, Sonos makes it easy to control your system and curate your favorite sounds all in one place. Our reimagined app delivers the industry's most streamlined streaming experience by bringing a world of content and intuitive control to the Home screen.***"

> **100+ streaming services, one Home screen**

The redesigned Sonos app prioritizes a listening experience that's human - allowing you to bring *your* true favorites front and center and ***giving you more control*** to make your streaming experience your own.

- **Get into your music (and off the app) faster**: No need to tap between tabs — the new Home screen serves up all your favorite content and controls, all in one place. Quickly jump back into your recently played, browse libraries and recommendations from your preferred services, and fill your home with music and all the sounds you love.

- **Customize and curate**: Enjoy unparalleled curation by designing your Home screen to reflect how *you* listen. Pin rows of your favorite content and services; then move, edit, or rearrange them to your liking.

- **Search every streaming library**: Look for an artist, song, podcast, or audiobook ***across all your preferred streaming apps at once via an easy-to-use search bar*** that's always available right on your Home screen.

- **Elevated system control:** Swipe up from the bottom of your Home screen to ***seamlessly control your entire system*** and access a visual overview of what's playing on each of your products, quickly group speakers, and dial in on the perfect volume from anywhere in the app.

Accessible from any modern web browser, a brand new web app allows listeners the same seamless system control as the mobile app. The web app will replace the existing Sonos desktop controller and will be available alongside the redesigned mobile app on May 7, 2024.

46.    Thus, the App Redesign replaced earlier versions of the Sonos App for both iOS and Android. The App Redesign did not include an app for desktop computers; rather, the preexisting desktop app was discontinued and replaced by a

new web app included in the App Redesign. The web app runs via an internet browser, rather than running locally on a desktop computer as the desktop app did.

47.    As used herein, "App Redesign" refers to all sub-versions of the App Redesign, which was originally released as version 80.00 for both Android and iOS. Sonos has released numerous sub-versions of the App Redesign. However, as discussed herein, despite any attempted fixes or improvements in those sub-versions, the App Redesign still causes degraded performance relative to the previous S1 and S2 versions of the App.

48.    Sonos made the App Redesign available to users on May 7, 2024. Sonos designated it as version 80.00 of the Sonos App. In the Apple App Store, as shown in the following graphic, Sonos described the App Redesign as an "update [that] brings a new look and feel to the app. Get to your favorite music faster. Enjoy easier control of your system. And personalize your experience."



49.     Sonos later released sub-versions of the App, for both iPhone and iOS, and provided similar descriptions. For instance, Sonos repeated the description from the paragraph above for versions 80.00.02 and 80.00.04 of the iOS version of the App, as shown here:

## Version History

**80.00.04**                                              2h ago
This update brings a new look and feel to the app. Get to your favorite music faster. Enjoy easier control of your system. And personalize your    more

**80.00.02**                                              9h ago
This update brings a new look and feel to the app. Get to your favorite music faster. Enjoy easier control of your system. And personalize your    more

**80.00**                                                11h ago
This update brings a new look and feel to the app. Get to your favorite music faster. Enjoy easier control of your system. And personalize your    more

**16.1**                                                  1mo ago
Bug fixes and improved performance.

**16.0**                                                  3mo ago
Bug fixes and improved performance.

50.     Sonos provided similar descriptions for the Android version of the App Redesign, as shown here:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

51.    On its website, Sonos touted that "[t]he Sonos app is redesigned and better than ever. Get the latest update now."[7] Sonos told users that the App Redesign was "Your key to the ultimate listening experience," stating that "The Sonos app brings all your content and settings together in one place for effortless control."[8]

52.    Sonos also represented that the App Redesign was "[b]etter by redesign," stating that "[t]he latest update brings a new look and feel to the Sonos app. Get to your favorite music *faster*. Enjoy *easier control* of your system. And personalize your experience."[9] Sonos told users:

**Welcome to your new Home screen**

Once you open the app, everything you need is at your fingertips. *Quickly* jump back into recent favorites, browse services, search for content, find recommendations, and control your system.

\* \* \*

**Find everything you want faster**

Search is always available at the bottom of the Home screen. Just enter the artist, genre, album, or song you want, and get a set of combined results from all your services.

---

[7] As of May 9, 2024 (https://web.archive.org/web/20240509194954/https://www.sonos.com/en-us/controller-app).

[8] As of June 9, 2024 (https://web.archive.org/web/20240609153308/https://www.sonos.com/en-us/controller-app).

[9] *Id.*

\* \* \*

**Curate and customize**

Save playlists, artists, and stations from any service to Sonos Favorites to create the ultimate music library. Add and edit Collections to your Home screen for ***easy access*** to go-to content.

\* \* \*

**Get a clearer view of your system**

Swipe up from the the [sic] bottom of the Home screen to view and control each speaker and group. See what's playing where. Tap to pause or resume.

\* \* \*

**Complete control**

Play different music in different parts of your home, or group Sonos products for a truly immersive listening experience. Adjust the volume, change what's playing, and ***seamlessly*** move sound from one room to the next.

\* \* \*

**Streaming streamlined**

The Sonos app connects to all your favorite streaming services for music, podcasts, radio, and audiobooks, making it ***easy to navigate and play all the content you love***.

\* \* \*

**Unlock all the power of Sonos**

Access exclusive features like Trueplay$^{TM}$ tuning and Sonos Voice Control. Adjust speaker settings to your exact preference. And ***easily*** add speakers to your system.

CLASS ACTION COMPLAINT

53.    Sonos maintains a "Community" section on its website. There, users can have discussions in forums and pose questions to the community of users. Sonos employees with titles such as "community leader" are tasked with monitoring these forums and, at times, posting answers to user questions. In addition, Sonos issues news and announcements on the Community section. For instance, on April 23, 2024, a Sonos employee posted a tutorial entitled "Differences between S1/S2 and the new Sonos App."[10] The tutorial represented that "[t]he New Sonos App follows a different approach by giving you complete control at a glance." Under the heading, "What's changing," the post listed:

- The new Sonos app will become ***easier to use*** with [its] enhanced user interface.

- It will give you ***faster access to the most used features***.

54.    Sonos urged users to download subsequent sub-versions of the App Redesign by emphasizing that they provided "bug fixes" and "improved performance" relative to earlier versions. For instance, at least since the release of App Redesign sub-version 80.03.06 for iOS, on June 17, 2024, Sonos stated on the Apple App store that every subsequent sub-version of the App Redesign featured "bug fixes and improved performance."

---

[10] Marco B., *Differences between S1/S2 and the new Sonos App*, Sonos Community (Apr. 23, 2024), https://en.community.sonos.com/the-new-sonos-app-229144/differences-between-s1-s2-and-the-new-sonos-app-6891763.

55.    Sonos also encouraged owners of Sonos Devices to install the App Redesign by sending notifications to them directly on the Sonos App to inform them of the update and providing a link through which they could download the update.

56.    Further, Sonos compelled users to update the Sonos App for compatibility purposes. Each Sonos Device has Sonos firmware built into the device itself. Sonos sells its devices with their settings configured to *automatically* download firmware updates. When the firmware on a Sonos device is updated, the older version of the Sonos App is no longer compatible with that device. In that case, a user attempting to use the Sonos App will be unable to do so and will see the following, or a substantially similar, message:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    57.    Thus, when a user's Sonos Device firmware is updated, even without

18  their affirmative choice to do so, the user is then required to update their Sonos App

19  in order to be able to use their Sonos Device. If a user has multiple Sonos devices,

20  if the firmware on just one of them is updated, the user will be forced to download

21

22  the updated App Redesign in order to be able to use the Sonos App and control the

23
24
25
26
27
28

system (and all Sonos Devices therein) that includes the device with the upgraded firmware.[11]

58.     Therefore, Sonos encouraged, and often compelled, users to download the App Redesign, misrepresenting and failing to disclose its numerous defects and that it would degrade the performance of the Sonos App and their Sonos Devices.

### D.     The Sonos Devices

59.     As discussed above, Sonos sold numerous products prior to and after the App Redesign, including those listed above.

60.     As used herein, "Sonos Devices" means any Sonos product that is installed or controlled using the Sonos App, including but not limited to speakers, amplifiers, network audio streamers, and headphones.

61.     Currently, Sonos sells Sonos Devices at list prices ranging from $179 (for the Roam 2, a portable smart speaker) to $999 (for the Arc Ultra, a smart soundbar, or for a pair of In-Ceiling Speakers), and up to $3,145 for a "Premium Personal Entertainment Set with Arc Ultra" (containing, in addition to the Arc Ultra, the Sonos Ace headphones, a Sub 4 subwoofer, and two Era 300 smart speakers). In addition, because a major appeal of Sonos Devices is that the user can

---

[11]  nik9669a, Response to *Sonos forcing update*, Sonos Community (July 18, 2024), https://en.community.sonos.com/controllers-and-music-services-229131/sonos-forcing-update-6899837.

connect several of them in a single, multi-room system and control them all using the Sonos App, many users have purchased multiple Sonos Devices.

### E.    The App Redesign Degraded the Performance of Sonos Devices

62.    The App Redesign substantially degraded the performance of Sonos Devices in comparison to the prior versions of the Sonos App that were available for the devices.

63.    Plaintiff experienced his Sonos Devices glitching, performing more slowly lagging, or not working at all when performing basic functions on their devices, including the following problems: audio playing on multiple Sonos speakers is not in sync, his Devices will not connect to his home network, and the App is unable to connect to music streaming services that it purportedly supports.

64.    The problems with the App Redesign have been extensively documented. Nearly immediately after Sonos released the App Redesign, a large number of customers began complaining about degraded performance, missing features, and other problems. On May 8, 2024—the day after the release—*The Verge*, a widely read online tech industry publication, reported that "[j]udging by the reaction on Sonos's very active subreddit, yep, the company took a scalpel to

things and left a ton of stuff out."[12] As *The Verge* reported, these problems included:

- "Features related to local music libraries are a mess — especially search."

- "The app's accessibility has regressed," referring to accessibility features for users whose vision is impaired.

- "Sleep timer functionality is totally gone."

- "Something as simple as editing the upcoming queue from inside the app? Even that's not available at the moment."

65.     Further, as noted above, there was no way for users to downgrade back from the App Redesign to a prior version of the Sonos App on iOS devices. Android users similarly reported being unable to downgrade to a prior version of the Sonos App. Sonos also discouraged users from even trying to revert to a prior version of the Sonos App, with Tucker Severson, Director of Product Management, advising users that "[r]olling back to the previous version of the Sonos app is likely to cause issues."

66.     In another article published the next day (May 9, 2024), *The Verge* reported that Sonos had provided the following statement:

Redesigning the Sonos app is an ambitious undertaking that represents just how seriously we are committed to invention and re-invention," said chief product officer Maxime Bouvat-Merlin. "It takes courage

---

[12] Chris Welch, *The new Sonos app is missing a lot of features, and people aren't happy*, Verge (May 8, 2024 10:30 AM), https://www.theverge.com/2024/5/8/24151704/sonos-new-app-bad-reviews-missing-features.

to rebuild a brand's core product from the ground up, and to do so **_knowing it may require taking a few steps back_** to ultimately leap into the future."[13]

67.    On May 14, 2024, in response to the flood of user complaints, Sonos held an "Ask Me Anything" ("AMA") event on the Community forums section of its website. The event, which lasted three hours, featured a panel of three Sonos employees: Diane Roberts, Senior Director of Software Development; Kate Wojogbe, Senior Director of User Experience; and Tucker Severson, Director of Product Management. During the event, users made over seven-hundred posts, with questions regarding and criticisms of the App Redesign. In addition, Sonos staff reported receiving numerous direct messages from users.

68.    The questions posed, and answers given, during the AMA event included: [14]

Question: *Will My Library be added back to Global search?*

Answer (KW): Yes! We will be adding your local music library to search in the coming weeks.

Question: *I almost always use my Sonos devices in groups, and with the new app, handling of group volumes is worse. Not only does it not change in real-time like the former app, you end up with a UI pop-up on top of the volume slider I am using to adjust the volume. See the*

---

[13] Chris Welch, *Sonos says its controversial app redesign took 'courage,'* Verge (May 9, 2024 9:51 AM), https://www.theverge.com/2024/5/9/24152675/sonos-new-app-bad-reviews-response-statement.

[14] *See New Sonos App - Community AMA Recap*, Sonos Community (May 14, 2024) https://en.community.sonos.com/events-at-sonos-229141/new-sonos-app-community-ama-recap-6893728. The Sonos staff member that gave the answered is indicated by initials: DR for Diane Roberts, KW for Kate Wojogbe, and TS for Tucker Severson.

*video below of before and after. Will this be fixed in a future app update?*

Answer (KW): I recognize that we have a ways to go to improve this tablet layout. Full stop. We will be continuing to improve this display and other UI improvements for tablets. No exact timing yet to share here, but the team shares your desire to make this and other layout improvements.

Question: *When the app was getting ready to be released, what were your personal feelings regarding the new app? Did you anticipate that it would be so poorly received?*

Answer (KW): I've personally been excited to bring the experience to our users, but also understand that anytime you are making a change to an interface that someone uses, you're going to be met with a breadth of reactions, and understandably some negative ones, simply due to the nature of change. We knew that some customers would be understandably upset by the delay in certain features, but are eager to continue to roll out updates to ensure these features are in place, and to address the feedback we are getting from our users. I'm thankful to have an app that is easier for the team to work with and publish updates to with far greater frequency than we've had in the past.

Question: *Setting aside all the "why did you do this release like this", can you tell us how you will ensure it wont happen in the future, and what the plan is to address customer input in a more coherent way?*

Answer (TS): Our goal is to build the best products for you—to add sound to your lives. Along the way we may make mistakes. What we learned this past week is that we should have communicated more openly with you about changes that may impact you.

Question: *Sonos now claims that some of the most serious defects will be corrected in the 21 May release, but hopefully the panel can understand that there are a lot of blind people who can't trust Sonos anymore. Given that Sonos got it so horribly wrong with this current release, why should we expect anything better in the next? Will Sonos offer an apology to its blind users and accept that it got this wrong, and will Sonos commit to creating a Chief Accessibility Officer as a tangible commitment to ensuring this never happens again?*

CLASS ACTION COMPLAINT

<u>Answer (DR)</u>: Thank you for your heartfelt feedback. We invested our user experience and engineering energy on supporting VoiceOver throughout this project. Unfortunately near the end, we took our eye off the ball and missed a couple of key bugs. Those bug fixes have been shipped in a release today.

<u>Question</u>: *I noticed that the re-introduction of alarms actually required an update to Sonos devices as well as the app today. Does this mean that the new UI revamp was in fact much more than just a revamp to the UI? Are there currently bigger changes happening on the device side as well?*

<u>Answer (DR)</u>: The app is definitely a revamp, but it's not just the UI that changed! This new app is using new features on the speaker firmware and new cloud services as well. Let me share a bit more about what happened with alarm settings. ***On the morning of the app launch, we discovered a data corruption error*** around the new Alarms APIs. The corruption could cause alarms to go off in the wrong room at the wrong volume with the wrong content! In order to save your alarms, ***we made the difficult decision to remotely disable the alarm settings feature and then completely lock it out.*** It allowed us to make sure your alarms stayed as they were - but at the steep cost of taking away your ability to change them yourself. The team rallied to make sure we could turn this feature back on safely - and today we are so delighted to say that we have re-enabled alarm settings. To get this feature, you must do a full system update.

<u>Question</u>: *Do you factor in this loss of trust? Has this been costed? Was there a risk benefit analysis of releasing the app in such an unready state? Or did the the* [sic] *response to this app come as a surprise to you?*

<u>Answer (DR)</u>: We did factor in a risk analysis about delaying some features along with the timing of the release. That risk-benefit analysis was carefully done across many decisions about what to prioritize. One thing I would like to restate from an earlier reply - we never intended to ship without Alarm Settings. [The answer then reiterated the response made above regarding the "data corruption error around the new Alarms APIs.]

CLASS ACTION COMPLAINT

69.    One user asked the fundamental question: "What was the thought process behind releasing the app update in an obviously unfinished state, instead of waiting for critical issues to be resolved?"

70.    In response, Mr. Severson stated:

An app is never finished!

It's probably a good idea to give you some background. This is a new app - we started from an empty project file. As the project progressed, we stopped investing our time in the old app code. Over time we "cross-faded" our engineering attention into the new app. We need to make the new app be **the app** going forward so we stop splitting our attention.

***We decided that now is the moment to bring you the new app.*** This is the beginning, and we will be continually iterating going forward. As I said - an app is never finished.

71.    As *The Verge* observed, "that doesn't actually explain what was so pressing that the app needed to ship in early May — several weeks ahead of a rumored June release for the long-awaited Sonos Ace headphones, which will be reliant on the new app."[15]

72.    *The Verge* further reported that

[T]his situation has seriously shaken trust in the brand for those who regularly used now-missing features like local music search, sleep timers, and more. According to Sonos' recent estimates, some of those capabilities won't be coming back until June. It's perfectly fair to question why there was never an open beta for this reworked Sonos app or a transition phase between old and new to prevent customers

---

[15] Chris Welch, *Sonos customers complain about missing features in redesigned app in community AMA*, Verge (May 14, 2024 5:30 PM). https://www.theverge.com/2024/5/14/24156703/sonos-app-redesign-new-ama-complaints.

from suddenly losing functionality. ***The company's emails advertising the new app didn't mention any of these shortcomings***.

73.   Those shortcomings included:

- Intermittent loss of connection between the App and Sonos Devices and systems, stopping audio playback, and inability to re-establish connection, rendering the Devices and systems useless, or significant lag when attempting to establish connection between the App and Devices and systems.

- Intermittent disappearance of Sonos Devices and systems from the Sonos App, stopping any audio playback and preventing user from using the Devices and systems, rendering the Devices and systems useless.

- Inability to "group" Sonos Devices on a Sonos System so that the grouped devices play the same audio simultaneously.

- Inability to use the App Redesign to "shuffle" play in combined music library from multiple supported apps.

- Inability to use "play next" or "play last" buttons in the App.

- Inability to change volume, as the App does not respond to user commands to change volume, or does so only after significant delay, which prevents user from assessing the volume change as they attempt to make it.

- Overall "lag" in the App, meaning the App's response to user commands is significantly delayed.

- Frequent "crashing" of the App, interfering with audio playback and user's ability to use the App to control the Devices.

- Devices playing audio unexpectedly without user input.

- Inability to connect audio sources, such as Apple's iTunes, Apple Music, and iHeartRadio, to the App.

74.     In its announcements touting the App Redesign, and in its description of the App Redesign in the Apple App Store, Android app stores, and within the App itself, Sonos misrepresented the App Redesign as improving performance and did not disclose that the update would degrade the performance of Sonos Devices. Plaintiff, like Sonos Device users in general, would not have installed the App Redesign on his Sonos Devices had he known that the installation would result in the performance degradation and other damage described in this complaint, or if he was not compelled to by Sonos. Moreover, because Plaintiff read Sonos's statements touting the App Redesign prior to installing the App Redesign, he would not have installed the App Redesign had Sonos warned users that the App Redesign would seriously degrade the performance of their Sonos Devices. Indeed, Sonos Device users at large would similarly not have installed the App Redesign had they received such a warning.

75.     Sonos has been forced to repeatedly recognize that the App Redesign degraded the performance of Sonos Devices. For instance, during an earnings call on August 7, 2024, CEO Spence admitted that "[w]ith the app, my push for speed backfired." He continued: "As we rolled out the new software to more and more users, it became evident that there were stubborn bugs we had not discovered in our testing. As a result, far too many of *our customers . . . are having an experience that is worse than what they previously had*."

76.    While the Company assured users that it would quickly add missing features, this was delayed by the scope of the problem, as acknowledged by CEO Spence in a letter to users published on July 25, 2024:

> We know that too many of you have experienced significant problems with our new app which rolled out on [May 7], and I want to begin by personally apologizing for disappointing you. There isn't an employee at Sonos who isn't pained by having let you down, and I assure you that fixing the app for all of our customers and partners has been and continues to be our **number one priority**.

> We developed the new app to create a better experience, with the ability to drive more innovation in the future, and with the knowledge that it would get better over time. However, ***since launch we have found a number of issues. Fixing these issues has delayed our prior plan to quickly incorporate missing features and functionality***.

77.    The problems with the App Redesign were so substantial that the Company considered re-releasing the S2 app for Android and iOS device. In an AMA event on Reddit on August 20, 2024, CEO Spence answered questions from users. During the event, Spence stated:

> Everything has been on the table in terms of finding the fastest path to fixing your systems. In fact, ***until very recently I'd been hopeful that we could re-release the old app (S2) as an alternative for those of you that are having issues that we've not yet resolved***.

> ***The trick of course is that Sonos is not just the mobile app, but software that runs on your speakers and in the cloud too***. In the months ***since the new mobile app launched we've been updating the software that runs on our speakers and in the cloud to the point where today S2 is less reliable & less stable then what you remember***. ***After doing extensive testing we've reluctantly concluded that re-releasing S2 would make the problems worse, not better***. I'm sure this is disappointing. It was disappointing to me.

78.    Thus, users were stuck with the App Redesign.

79.    In an October 1, 2024 press release, Spence was quoted as stating that "[o]ur priority since its release has been - and continues to be - ***fixing*** the app. ***There were missteps***, and we first went deep to understand how we got here, and then moved to convert those learnings into action." Sonos told users that it would make certain "commitments which fall into two categories: addressing the root causes of the problems with the app release, and regaining the trust of our customers." These included a commitment to "establish ambitious quality benchmarks at the outset of product development and [to] not launch products before meeting these criteria," implicitly conceding that Sonos did not have "ambitious quality benchmarks" before it released the App Redesign and that the App Redesign did not meet such standards.

80.    A *Wall Street Journal* article published in January 2025 called the App Redesign a $500 million "debacle," referring to the decline in the Company's market capitalization in the wake of the App Redesign.[16] However, the episode is still not behind the Company, or its users.

81.    On January 13, 2025, Sonos announced that that Spence was stepping down as CEO, effective immediately. The very next day, Sonos announced that

---

[16] Ben Cohen, *The $500 Million Debacle at Sonos That Just Won't End*, Wall St. J. (Jan. 17, 2025 9:00 PM), https://www.wsj.com/tech/sonos-speakers-app-ceo-24250f2c.

Chief Product Officer Maxime Bouvat-Merlin would also leave the Company. The departure of Global Chief Marketing Officer, Jordan Saxemard, was announced on February 10, 2025. Nine days later, Sonos announced the resignation of its Chief Commercial Officer, Deirdre Findlay.

82.    Sonos claimed in its October 1, 2024 press release that "[m]ore than 80% of the app's missing features have been reintroduced and the company expects to have almost 100% restored in the coming weeks." However, Sonos did not keep this promise. A March 14, 2025 letter from Chief Innovation Officer Nick Millington stated that he and his team were "100% focused on two important priorities," including "closing gaps in the functionality and usability of the new app relative to what you enjoyed before, in a priority order that is as responsive as possible to the feedback we receive from you," making clear that those gaps persist. Even as of the date of this filing, the App Redesign has degraded functionality relative to prior versions of the Sonos App.

83.    Installation of the App Redesign on Sonos Devices easily caused more than $5,000,000 in damages to the class within the first year of the release of the App Redesign. While Plaintiff intends to introduce expert evidence to prove damages, and expects that expert evidence to include economic analysis using methods accepted by experts in relevant fields, multiple bases for approximating damages all demonstrate that classwide damages in this case are substantial and

well above $5,000,000. First, damages may be assessed by asking what value Plaintiff placed on the features he lost with the installation of the App Redesign, which may be approximated by asking what Plaintiff would have paid to remove the App Redesign from his iOS and/or Android devices and downgrade to a prior version of the Sonos App. Plaintiff in this case has stated that he would have paid at $1200 to *uninstall* the App Redesign and revert to a prior version of the Sonos App to reverse the damage that was caused by the App Redesign. Plaintiff's experience is typical of other Class members, who would pay similar amounts to uninstall the App Redesign. Accordingly, the installation of the App Redesign caused at least $1200 of damages to each Sonos Device owned by a user who downloaded the App Redesign. Further, as one of the principal selling points of Sonos Devices is that multiple devices can be connected in a single system, many Sonos users have multiple Sonos Devices. The number of Sonos users who downloaded the App Redesign within the first year of its release certainly exceeds one million and is likely many millions, and each of these users suffered, at minimum, $100 in damages.[17] Accordingly, within the first year of its release of

---

[17] These figures follow from the fact that Sonos reported that, as of September 28, 2024, its devices were registered in approximately 16.3 million households globally, with each household averaging 3.1 Sonos Devices, and the majority of its revenue came from the United States. *See supra* ¶ 33.

the App Redesign, Sonos caused the putative Class well in excess of $5,000,000 in damages, and likely damages of at least hundreds of millions of dollars.

84.    However, estimating damages by approximating the value Plaintiff places on the functionality and features he lost with the installation of the App Redesign likely underestimates damages in this case because, among other reasons, Plaintiff cannot remove the App Redesign. Rather, users must either wait for all lost performance capabilities to be replaced (which Sonos has not done yet, over a year after it released the App Redesign)[18] or must replace their Sonos Devices with competing products from another company. Most Sonos users keep their devices for years, at least when they are performing as expected. A second method of estimating damages is based on the cost to replace Sonos Devices with competing products. Industry and consumer websites have identified several competitors for Sonos products, including the Pulse Mini 2i Speaker (from Bluesound), C10 MKII Wireless Speaker (from Audio Pro), and the HEOS Wireless Amplifier (from Denon). List prices for these products range from $480 to $699, and multiple products might be required to replace the functionality of a user's Sonos Devices. For instance, Denon's HEOS Wireless Amplifier amplifies audio, but it must be

---

[18] Even if Sonos were to completely fix all of the problems with the App Redesign — which it has not done to date — the class would still suffer from the substantial damages incurred from their being forced to use the flawed App Redesign until that time or to pay for different products to replace their Sonos Devices.

connected to a speaker to play the audio. Multiple products would also be required to replace the Sonos Devices of Class members that owned multiple Sonos Devices. Accordingly, damages using replacement cost for a class that likely numbers in the millions would range from at least hundreds of millions to billions of dollars (excluding tax- and shipping-related damages).

85.    Damages may also be calculated using other methods and/or under other theories of damages that may result in significantly higher total damages, including additional methods and theories to be introduced through expert discovery.

## V.    CLASS ACTION ALLEGATIONS

86.    Plaintiff seeks certification of the following class, pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 23(b)(2) and (b)(3), as applicable, and (c)(4):

> All purchasers, owners, users, or lessees of any Sonos Device in the United States whose Sonos App was running any version of the App Redesign.

87.    In the alternative, Plaintiff seeks certification of the following subclass:

> **Massachusetts Subclass:** All purchasers, owners, users, or lessees of any Sonos Device in Massachusetts whose Sonos App was running any version of the App Redesign.

88.    The class and subclass defined above are collectively referred to herein as the "Class," unless specifically stated otherwise.

CLASS ACTION COMPLAINT

89.    Excluded from the Class are Sonos, its subsidiaries, affiliates, officers, directors, and employees.

90.    **Numerosity** under Fed. R. Civ. P. 23(a)(1): The members of each class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. Plaintiff is informed and believes—based upon the publicly-available information discussed herein—that there are hundreds of thousands or millions of class members, making joinder impracticable. Those individuals' identities are available through Sonos's records, and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

91.    **Commonality and Predominance** under Fed. R. Civ. P. 23(a)(2) and (b)(3), respectively: Sonos has acted with respect to Plaintiff and the other members of the Class in a manner generally applicable to each of them. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Class predominate over the questions that may affect individual class members, including the following:

    a.  Whether the App Redesign damaged the performance of the Sonos Devices;

    b.  Whether Sonos misrepresented or omitted the effect of the App Redesign of the Sonos Devices;

c. Whether Sonos knew that the App Redesign would damage the performance of the Sonos Devices;

d. Whether Sonos's uniform conduct violated each of the causes of action set forth below, including the California Computer Data Access and Fraud Act, Cal. Penal Code §§ 502, et seq.; California False and Misleading Advertising Law, Cal. Bus. & Prof. Code, §§ 17500 et seq.; trespass to chattels; Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; and the other state laws that Sonos is alleged herein to have violated;

e. Whether compensatory, trebled, consequential, or statutory damages, restitution, or attorneys' fees should be awarded to Plaintiff and the other Class members, where permissible by statute;

f. Whether injunctive and/or other equitable relief is appropriate, and what that relief should be.

92. **Typicality** under Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

93. **Adequacy of Representation** under Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is an adequate class representative because his interests do not conflict with the interests of Class members who he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

94.    **Declaratory and Injunctive Relief** under Fed. R. Civ. P. 23(b)(2): The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Sonos. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Sonos has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

95.    Injunctive relief is particularly necessary in this case because Plaintiff and other Class members continue to own their Sonos Devices and Sonos will continue to offer updates, as it has done regularly since introducing the first Sonos App. These updates contain important features, and owners of the Sonos Devices should be able to obtain these benefits for their Sonos Devices without also damaging the performance of their devices. Sonos should be enjoined from continuing the *status quo*, which currently is to convince Sonos users to download the App Redesign by disclosing the benefits of the App Redesign and failing to disclose the significant performance problems caused by the App Redesign, or forcing users to download the App Redesign by updating the firmware of their Sonos Devices. At the very least, Sonos users should be told whether an update

will negatively impact the performance of their App and Devices so that they can make an informed decision.

96.    **Superiority** under Fed. R. Civ. P. 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Sonos, so it would be impracticable for Class members to individually seek redress for Sonos's wrongful conduct. Even if Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    CAUSES OF ACTION

97.    Plaintiff brings the following causes of action. In addition to Sonos's violation of federal law described in Count I, Counts II through V brought under California law apply to the entire Class because Sonos's conduct, as described herein, originated from California, the Sonos Devices and App Redesign were

designed and originated in California, and Sonos published a Terms of Use, License, and Warranty Agreement for U.S. users ("Terms of Use") providing that California law shall apply. In the alternative, Count VI is brought by Plaintiff on behalf of the Massachusetts Subclass.

## COUNT I

### VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. §§ 1030, ET SEQ.

98.    Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

99.    Sonos caused Plaintiff and Class members to download and install the App Redesign without informing them that the App Redesign would diminish the performance of their Sonos Devices. Accordingly, Plaintiff and Class Members did not give permission for Sonos to damage and/or disrupt their Sonos Devices via the App Redesign—nor could they—as Sonos omitted material information to Plaintiff and Class Members regarding the App Redesign.

100.    Plaintiff and Class members' Sonos Devices, and the iOS and Android devices on which they installed the App Redesign, are protected computers as defined in 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and/or are communication devices. Sonos violated 18 U.S.C. § 1030(a)(5)(A) because it knowingly caused the transmission of a program, information, code, or command by sending the App Redesign update, and, as a result of Sonos's knowing

transmission, Sonos intentionally caused damages without authorization to Plaintiff's Sonos Devices. Sonos programmers wrote every aspect of the App Redesign. Sonos tested the App Redesign prior to releasing it to the public, and Sonos knew that the App Redesign would significantly degrade the performance of Sonos devices. As alleged above, Plaintiff and Class members did not know that the App Redesign would damage their Sonos Devices and, therefore, did not authorize such damage.

101.    Sonos's conduct has caused Plaintiff and Class members economic damages. Because the Sonos App is necessary to install and use Sonos Devices, in whole or in part, the defects in the App Redesign lowered the value of Sonos Devices.

102.    Class members, including Plaintiff, have additionally suffered the impaired use of their Sonos Devices. Immediately after installing the App Redesign, their ability to control their Sonos Devices became slower and they lost many preexisting features of the App, and they should be compensated for such reduction in function.

103.    Unless Sonos is restrained and enjoined, Sonos will continue to commit such acts. As alleged above, Sonos App updates contain important features and, for that reason, Sonos users must be protected from future damage to their devices by impending updates they may wish to implement to benefit from these

features. Money damages alone are inadequate, entitling Plaintiff to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

104.    Plaintiff and Class members suffered damages as a result of Sonos's actions. Plaintiff seeks all damages available as a result of Sonos's violation of the Consumer Fraud and Abuse Act.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT
### CAL. PENAL CODE §§ 502, ET SEQ.

105.    Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

106.    In pushing the App Redesign to unsuspecting users of Sonos Devices, Sonos violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code §§ 502, et seq. ("CDAFA").

107.    Sonos specifically violated Cal. Penal Code § 502 (c)(4) and (c)(5).

108.    As to Cal. Penal Code § 502(c)(4), Sonos knowingly accessed a computer system (the devices on which the App Redesign was installed) by providing and installing the App Redesign, which degraded the performance of each user's App and Sonos Devices. Sonos did not inform Plaintiff or Class members that installation of the App Redesign would degrade the performance of

their App and Sonos Devices, and, therefore, Plaintiff and other Class members did not consent to the damages.

109.    As to Cal. Penal Code § 502(c)(5), Sonos knowingly and without consent disrupted computer services by installing software updates (the App Redesign) to the devices on which the App Redesign was installed, which, as alleged above, degraded the performance of the App and of the Sonos Devices. "Computer services" is defined by Cal. Penal Code § 502(b)(4) as "computer time, data processing, or storage functions, Internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." The Sonos Devices and the devices (such as smartphones) on which the App Redesign was installed are and/or provide computer services within the meaning of the statute.

110.    Because class members did not know that the updates would degrade the performance of their devices, they did not give Sonos permission to access, damage, and/or disrupt their App and Sonos Devices.

111.    Plaintiff and Class members suffered damages as a result of Sonos's actions. Plaintiff seeks all damages available as a result of Sonos's unlawful conduct.

CLASS ACTION COMPLAINT

## **COUNT III**

### **VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING LAW CAL. BUS. & PROF. CODE §§ 17500 ET SEQ.**

112.  Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

113.  Sonos's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public. Sonos mispresented the performance of the App Redesign, concealed the performance degradation of the Sonos Devices caused by the App Redesign, and misrepresented the purpose of the App Redesign.

114.  By its actions, Sonos disseminated uniform advertising regarding the App Redesign based out of California and governed by California law. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, et seq. Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

115.  The above-described false, misleading, and deceptive advertising Sonos disseminated continues to have a likelihood to deceive in that Sonos failed to disclose the true nature of the App Redesign and its impact on Sonos Devices, continuing to deceive consumers.

116.   Sonos misrepresented to consumers that the App Redesign improved or maintained the performance of the Sonos Devices even though it actually degraded the performance of the devices. Had Sonos disclosed those issues, rather than falsely advertising the App Redesign, consumers would have not downloaded the App Redesign onto their devices. In addition, had Sonos disclosed the way in which increasingly the App Redesign would affect the performance of their Sonos Devices, consumers would not have purchased their Sonos Devices for the price that Sonos charged.

117.   In making and disseminating the statements alleged herein, Sonos knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiff and other Class members based their decisions to download the App Redesign on Sonos's material misrepresentations and omitted material facts. Plaintiff and Slass members were injured in fact and lost money and property as a result.

118.   The misrepresentations and non-disclosures by Sonos of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

119.   As a result of Sonos's wrongful conduct, Plaintiff and Class members have suffered economic injury and other harm.

120. Monetary damages and other legal remedies are inadequate to address Sonos's wrongful practices described in this complaint. Among other reasons, such remedies would not end Sonos's wrongful practices. Plaintiff is entitled to injunctive relief to address Sonos's wrongful conduct. Plaintiff further seeks any additional equitable relief to which they may be entitled.

## COUNT IV

## TRESPASS TO CHATTELS

121. Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

122. California common law prohibits the intentional intermeddling with personal property in the possession of another, without consent, that results in either a) the deprivation of the use of that personal property; or b) the impairment of the condition, quality, or usefulness of the property.

123. Sonos impaired the condition, quality, and usefulness of Plaintiff's and Class members' Sonos App and Devices, or parts of them, without their knowledge or consent. Such acts constituted an intentional interference with the use and enjoyment of the Sonos Devices.

124. Sonos acted intentionally, because it knew that Plaintiff and Class members were downloading computer software onto their Sonos Devices that reduced the performance of the devices. Plaintiff and other Class members

consented to the installation of the App Redesign only because it would improve or maintain performance, not diminish performance.

125.    Sonos engaged in deception to gain access to Sonos user devices on which the App Redesign was installed and to install new computer software in the form of the App Redesign.

126.    Plaintiff and Class members suffered damages as a result of Sonos's actions. Plaintiff seeks all damages available as a result of Sonos's trespass.

## COUNT V

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
### CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.

127.    Plaintiff realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

128.    Sonos is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

129.    Sonos violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

130.    Sonos has engaged in "unlawful" business practices by violating multiple laws, including the California Computer Access and Fraud Act, Cal. Penal Code §§ 502, et seq.; False and Misleading Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.; and trespass to chattels.

131. Sonos violated Cal. Bus. & Prof. Code § 17200's prohibition against "fraudulent" conduct by touting to consumers, including Plaintiff, that the App Redesign would improve their devices without disclosing the critically important information that the App Redesign would degrade the performance of their devices. Sonos's representations and omissions were likely to mislead reasonable consumers and did mislead them. Plaintiff and other members of the Class relied on Sonos's misrepresentations and would not have downloaded the App Redesign if they knew that such it would degrade the performance of their Sonos App and Sonos Devices. As alleged above, among other economic damage, the Sonos Devices are worth less now than before Sonos tricked them into installing the App Redesign.

132. Sonos's conduct is also "unfair" pursuant to the UCL. Sonos's conduct is substantially injurious to consumers like Plaintiff and other Class members, offends public policy, is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct—tricking Sonos users into downloading the App Redesign without disclosing the defects therein—outweighs any alleged benefit. Specifically, the utility gained by updating to or running the App Redesign was outweighed by the diminishment of the functionality of the devices. Sonos engaged in this conduct at the expense of its customers' rights when other, lawful alternatives were available—such as providing customers with full information

about the App Redesign or not releasing it until it was fixed, among other alternatives.

133.    As a result of Sonos's wrongful conduct, Plaintiff and the Class members have suffered economic injury and other harm.

134.    Monetary damages and other legal remedies are inadequate to address Sonos's wrongful practices described in this complaint. Among other reasons, such remedies would not end Sonos's wrongful practices. Plaintiff is entitled to injunctive relief to address Sonos's wrongful conduct. Plaintiff further seeks any additional equitable relief to which they may be entitled.

## CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS

## COUNT VI

## VIOLATIONS OF MASSACHUSETTS CONSUMER PROTECTION ACT MASS. GEN. LAWS ANN. CH. 93A, §§ 1, ET SEQ.

135.    The Massachusetts Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Massachusetts Subclass, realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

136.    Sonos and Massachusetts Subclass members are "persons" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

137.    Sonos operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

138.   Sonos advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

139.   Sonos engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

140.   Sonos's acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Sonos solely held the true facts about the App Redesign.

141.   Consumers could not have reasonably avoided injury because Sonos's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the App Redesign, Sonos created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

142.   Sonos's practices, omissions, and misrepresentations had no countervailing benefit to consumers or to competition.

143.   Sonos intended to mislead Plaintiff and Massachusetts Subclass members and induce them to rely on its misrepresentations and omissions. Sonos's

representations and omissions were material because they were likely to deceive reasonable consumers

144.    Sonos acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff's and Massachusetts Subclass members' rights. Sonos's knowledge of the App Redesign's performance issues put it on notice that the App Redesign and the Sonos Devices were not as it advertised.

145.    As a direct and proximate result of Sonos's unfair and deceptive practices, Plaintiff and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Sonos Devices, and increased time and expense in dealing with performance issues of the App Redesign and Sonos Devices.

146.    Plaintiff and Massachusetts Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages and statutory damages if available, treble damages if available, punitive damages if available, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

147.    This Count is included here as a placeholder for notice purposes only. Prior to the filing of this Complaint, Plaintiff sent a letter complying with Mass.

Gen. Laws ch. 93A, § 9(3) to Defendant. Once the statutory notice period has expired, Plaintiff intends to amend their Complaint to bring this count on behalf of Massachusetts purchasers who are members of the Class.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other Class members, respectfully requests that the Court enter an Order:

A.    Declaring that this action is a proper class action, certifying the Class and/or Subclasses as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B.    Enjoining Sonos from continuing the unlawful practices alleged herein;

C.    Ordering Sonos to pay actual and statutory damages (including treble and/or punitive damages) and restitution to Plaintiff and the other Class members, as allowable by law;

D.    Ordering Sonos to pay both pre- and post-judgment interest on any amounts awarded;

E.    Ordering Sonos to pay attorneys' fees and costs of suit, including as provided for under the causes of action described above and under California Code of Civil Procedure § 1021.5;

F.    Ordering injunctive relief and other appropriate equitable relief; and

G.      Ordering such other and further relief as may be just and proper.

VIII.    **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 25, 2025                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         /s/ Laurence M. Rosen
                                         355 S. Grand Avenue, Suite 2450
                                         Los Angeles, CA 90071
                                         Telephone: (213) 785-2610
                                         Facsimile: (213) 226-4684
                                         Email: lrosen@rosenlegal.com

                                         *Counsel for Plaintiff*